IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

TYSON FOODS, INC. and
TYSON POULTRY, INC.                                          PLAINTIFFS

          v.                    Civil No. 06-5177

THE DUPPS COMPANY and
RAINS-FLO MANUFACTURING COMPANY                             DEFENDANTS

O R D E R

Now on this 20th day of November, 2007, come on for consideration the following motions:

* **Motion For Summary Judgment Of The Dupps Company** (document #25);

* **Amended Motion For Summary Judgment Of The Dupps Company** (document #32);

* **Motion For Summary Judgment** of defendant Rains-Flo Manufacturing Company (document #34); and

* **Second Amended Motion For Summary Judgment Of The Dupps Company** (document #38),

and from said motions, the supporting documentation, and the responses thereto, the Court finds and orders as follows:

1.     This is a products liability case.  Plaintiffs Tyson Foods, Inc. And Tyson Poultry, Inc. (collectively "Tyson"), allege that a type of equipment purchased from defendant The Dupps Company ("Dupps") - referred to herein as a "Continuous Hydrolyzer" - was defective.  Tyson also alleges that the packing material used in the Continuous Hydrolyzers, manufactured by defendant Rains-Flo Manufacturing Company ("Rains-Flo"), was defective.

The Amended Complaint sets forth causes of action against Dupps for breach of express warranty; breach of implied warranty of fitness for a particular purpose; breach of implied warranty of merchantability;

negligence; and strict liability.  Claims are stated against Rains-Flo for breach of implied warranty of fitness for a particular purpose; breach of implied warranty of merchantability; negligence; and strict liability.

Both defendants denied the material allegations of the Amended Complaint, and both now move for summary judgment.  Tyson has responded, and the motions are ripe for decision.

2.  Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States**, 31 F.3d 696 (8th Cir. 1994).  Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party.  **Hardin v. Hussmann Corp.**, 45 F.3d 262 (8th Cir. 1995). The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute;  however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute.  **City of Mt. Pleasant, Iowa v. Associated Electric Co-op**, 838 F.2d 268 (8th Cir. 1988).

3.  Pursuant to **Local Rule 56.1**, the parties have filed statements of facts which they contend are not in dispute. From those statements, the following significant undisputed facts are made to appear:

*    As one aspect of Tyson's poultry processing business, it operates several rendering plants, in which poultry waste is rendered to useful byproducts.  One such rendering process is the hydrolyzation of chicken feathers into protein meal used in animal feed.  Hydrolyzation uses a machine called, appropriately, a hydrolyzer.

*    Between 1996 and 2003, Tyson purchased eight Continuous

Hydrolyzers from Dupps.  The Continuous Hydrolyzer is essentially a huge pressure cooker with an auger running through it to move the contents.  The auger must be sealed where it enters and exits the vessel.  In the Dupps Continuous Hydrolyzers, the sealed areas are referred to as stuffing boxes, and are held in place by packing glands which were filled - at times relevant to this lawsuit - with packing manufactured by Rains-Flo.  The packing glands must be periodically adjusted as the packing material wears down.  Tyson made its first purchase of Rains-Flo packing material on September 9, 1997.

       *    Dupps' terms and conditions of sale ("Dupps' Terms And Conditions") are set out in various documents attached as Exhibit A to the Affidavit of Jim Lyle.  Rains-Flo's terms and conditions of sale ("Rains-Flo Terms And Conditions") are set out in various documents attached as Exhibit B and C to the Affidavit of Scott Harris. While the parties dispute the meaning of some of the provisions of these documents, and dispute when some of them were received by Tyson, the authenticity of the documents is not in question, and they will be referred to as needed in this Order.

       *    Tyson was aware, as early as June 11, 1998, that hydrogen sulfide[1] (or "H2S") was a byproduct of the feather rendering process, and that the Continuous Hydrolyzers released hydrogen sulfide.  It provided training to its employees about some of the dangers of the gas. The parties dispute, however, the extent of Tyson's knowledge of the potential levels and potential dangers of hydrogen sulfide released from the Continuous Hydrolyzers as of June 11, 1998.

---

[1]According to an article in <u>Render</u> attached as an exhibit to Dupps' Motion For Summary Judgment, hydrogen sulfide is a colorless gas commonly described as smelling like rotten eggs.  It is a byproduct of decaying organic material such as blood, feathers, hair, meat, and offal.  At exposures of 20-50 ppm (parts per million) it causes eye irritation;  at 500 ppm it causes dizziness and cessation of breathing in a few minutes; at greater than 1000 ppm a single breath can be lethal.

*   On March 14, 2002, Tyson employee Robert Key was reportedly overcome with hydrogen sulfide from a Continuous Hydrolyzer at Tyson's Texarkana facility (the "Key Incident").  As a result of the Key Incident, Tyson's Texarkana Plant Manager, Bill Welborn, sent two e-mails to Tyson officers and employees on March 14, 2002.  While the significance of these e-mails is disputed, their authenticity is not, and the Court will refer to them as needed in this Order.

*   After the Key Incident, Tyson installed vent hoods over the stuffing boxes of the Continuous Hydrolyzers in its Texarkana plant to remove hydrogen sulfide.

*   In late 2002, Tyson contacted Rains-Flo about problems with the packing material, and in January, 2003, Scott Harris of Rains-Flo traveled to the Tyson plant in Scranton, Arkansas, to review the situation.

*   On October 10, 2003, Tyson employee Jason Kelley sustained fatal injuries at the Texarkana facility (the "Kelley Incident"), reportedly as a result of hydrogen sulfide exposure while adjusting the packing seals on a Continuous Hydrolyzer.  Tyson employee Billy Drumm was also overcome when he went to assist Kelley, but Drumm survived the Kelley Incident.

*   On December 30, 2003, there was a meeting at Tyson's Springdale offices attended by John Dupps (President of Dupps); Bill Lovette (Vice President of Tyson Foods); and other representatives of both companies.  At this meeting, Tyson informed Dupps of the Kelley Incident, and communicated notice of breach of warranty.

*   As a result of the December 30, 2003, meeting, Dupps designed and supplied to Tyson at no cost a vent hood over the stuffing boxes of its Continuous Hydrolyzers, the purpose of which was to contain and remove hydrogen sulfide.  Dupps also provided Tyson with warnings about hydrogen sulfide, and updated its instruction manual by instructing users to shut

-4-

down the units and depressurize them before making adjustments to the packing, in order to reduce leakage of hydrogen sulfide.

* Both Billy Drumm and the Estate of Jason Kelley filed lawsuits against Dupps as a result of the Kelley Incident.  The Kelley lawsuit included Rains-Flo as a defendant.  Tyson was put on notice of both lawsuits, and chose not to intervene.  Both lawsuits have now been settled and dismissed with prejudice.

* Three Tolling Agreements were executed by Tyson and Dupps.  The third and last of these, called the First Amended Tolling Agreement, includes extensions granted in the first two such documents, the Tolling Agreement and the Amended Tolling Agreement, and tolled the statute of limitations on all potential claims between Tyson and Dupps from March 2, 2005, until 60 days following August 1, 2006.

* This lawsuit was filed on September 22, 2006.

4.   Both Dupps and Rains-Flo contend that the statute of limitations had expired on Tyson's claims for negligence and strict products liability before suit was filed.  Dupps' argument is predicated upon its assertion that Tyson had actual knowledge of the alleged defects in the Continuous Hydrolyzer no later than 2001, when Tyson installed water sprayers over the stuffing boxes of the Continuous Hydrolyzers in its Scranton facility to remove hydrogen sulfide from the work environment. Dupps points out that a three-year statute of limitations governs both negligence (pursuant to **A.C.A. §16-56-105**) and strict products liability (pursuant to **A.C.A. §16-116-103**), and that even when one takes into consideration the extensions of the Tolling Agreements, the suit was untimely.

Rains-Flo takes the position that Tyson had knowledge that hydrogen sulfide was leaking from the stuffing boxes no later than March 14, 2002, the date of the Keys Incident.  There are no tolling agreements between

-5-

Tyson and Rains-Flo, and Rains-Flo contends that the suit filed on September 22, 2006, was untimely.

Tyson responds that Arkansas uses the discovery rule for determining when the statute of limitations begins to run in product liability actions. Under the discovery rule, the statute of limitations begins to run when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the connection between a defect in the product and the damages suffered. **Martin v. Arthur**, **339 Ark. 149, 3 S.W.3d 684 (1999)**. Tyson points out that reasonable doubts about when the statute of limitations begins to run should be resolved in its favor, as the nonmovant. **State v. Diamond Lakes Oil Co.**, **347 Ark. 618, 66 S.W.3d 613 (2002)**.

5.   While the Amended Complaint does not come right out and say so, the alleged defect upon which the products liability claim against Dupps is based is that the Continuous Hydrolyzers leaked hydrogen sulfide to such an extent as to cause a safety hazard, thus requiring Tyson to expend monies to modify them.[2]  Likewise, the negligence claim rests on allegations related to the leakage of hydrogen sulfide from the machines.

The corresponding claims against Rains-Flo rest on the allegation that the packing material either leaked, or failed to create a leak-free seal, so as to prevent hydrogen sulfide from escaping from the Continuous Hydrolyzers.

Tyson acknowledges knowing, as early as 1998, that hydrogen sulfide - in the concentrations normally found in its rendering facilities without regard to the use of the Continuous Hydrolyzers - could cause eye irritation.  It contends, however, that there are genuine issues of material

_____

[2]Paragraph 18 states that following the Kelley Incident, Tyson "implemented, and installed extensive protective and remedial measures to further insure a safe workplace for its employees working in and around the Continuous Hydrolyzers and Rains-Flo packing. . . . These and other actions taken by Tyson are all as a direct and proximate cause [sic] of the breaches by Dupps and Rains-Flo as described herein."

fact in dispute as to when it "became aware of the high emissions of hydrogen sulfide from the continuous hydrolyzer and the danger they posed." It contends that it "did not learn of the high concentrations that are immediately dangerous to life and health until the death of Jason Kelley in October 2003," and that it did not have a complete cause of action until Kelley's death.

6.     The Court disagrees with Tyson's position that it did not have a complete cause of action until Kelley's death.  It was not necessary that Tyson be aware that hydrogen sulfide leaking from the Continuous Hydrolyzers posed a risk of death in order to trigger the running of the statute of limitations. Tyson is not suing Dupps to recover damages for Kelley's death. Its claim is for economic loss[3] allegedly incurred because the Continuous Hydrolyzers did not perform as expected and as warranted, but instead leaked unacceptable amounts of hydrogen sulfide, which required Tyson to expend money to modify them and the facilities in which they were installed. Because the cost of those modifications forms the basis of Tyson's damages claim, it was Tyson's awareness of the need to make such modifications that triggers the statute of limitations.

The Court finds the following evidence determinative on when Tyson had, or reasonably should have had, this awareness:

*     Tyson employee Jerry Canerday, a safety manager, testified that he knew, as early as June, 1997, that at sufficient concentrations hydrogen sulfide was "IDLH," or "immediately dangerous to life and health." Specifically, he knew that "it could be fatal at over 800 parts per million."

---

[3]As with its products liability claim, Tyson does not come right out and say that its damages are purely economic in the Amended Complaint, but an exhibit to its Combined Response To Defendants' Statement Of Undisputed Material Facts lists its alleged damages, and they are all in the "economic loss" category.

* Canerday testified that "we did not know that we had hydrogen sulfide at the level at which it was IDLH in our facility," but when he worked at the Scranton facility in 1998 and 1999 he took weekly readings with a gas monitor for levels of hydrogen sulfide. He tested a "steam path" emanating from the Continuous Hydrolyzer. As the monitor approached the steam path, it began to register higher concentrations of hydrogen sulfide. When it was placed directly into the steam path, it would "peg the meter out." The meter was designed to register up to 999 ppm. Canerday attributed the high readings to a low oxygen concentration in the steam path, which he understood to distort the meter readings, but there is no evidence that he obtained a more accurate meter or followed up on these test results to ascertain the true levels of hydrogen sulfide.

* A Memo dated May 12, 1998, from Dupps employee J. Simmons reports on a service call made by Dupps employees E. McGhee, Jack Risner, and Simmons to Tyson's Scranton facility. The Dupps employees met with Tyson employees Jim Rofkhar, Carl Witmore and Bill Carter. The Memo notes that during the meeting, Rofkhar told the Dupps employees that Tyson's "hydrogen sulfide meter reads 25 to 100 ppm on the raw feathers, and that vapor readings were attempted in the vapor dome. The readings were so high they went 'off the scale' of the meter. [Rofkhar] did not know what the high-end ppm value was for this meter." It is clear from the context of the Memo that the "vapor dome" is part of the Continuous Hydrolyzer.

* A document entitled RIVER VALLEY ANIMAL FOODS HYDROGEN SULFIDE TEST, dated June 11 & 12, 1998, warned Tyson employees "[w]hen replacing the packing in the hydrolizers, beware of the steam. This is the area where the largest concetration [sic] of H2S is present. Always test the area prior to working on any area of the hydrolizer where steam may be present. If the test results in the steam path and in the area are below 20 ppm no

-8-

protection is necessary.  If H2S is present between 20 and 100 ppm an air purification respirator with the appropriate cartridges is required.  If the concentration is greater than 100 ppm an air supplied (SCBA) respirator is required."

* A letter from Forrest Adams (also a safety manager or industrial hygienist) to Jim Rofkahr dated June 16, 1998, stated that air monitoring at the River Valley facility[4] had identified "the platforms above the hydrolizers" as areas of high levels of hydrogen sulfide.  Adams noted that he had "observed the fans that you installed to help the ventilation near the hydrolizers.  I also understand that you have ordered more fans to install below the hydrolizers to help push vapors up to the scrubber system."

* Canerday testified that fans and "spray bars" were being used in Tyson's Scranton facility as early as 1998, 1999, or 2000 to try to remove hydrogen sulfide from around the Continuous Hydrolyzers.

* Two e-mails from Bill Welborn, Plant Manager at Tyson's Texarkana facility, were sent on March 14, 2002, the date of the Key Incident.  The first of these noted:

> WE HAD ANOTHER INCIDENT THIS MORNING WITH HYDROGEN SULFIDE ON THE FEED END BEARING/PACKING AREA. . . . WE MUST ALL UNDERSTAND HOW VERY DANGEROUS THIS GAS IS - IT CAN KILL YOU!  WE HAVE A MAN IN THE HOSPITAL RIGHT NOW FROM BREATHING THE FUMES THIS MORNING AND HE ONLY SPENT A FEW MINUTES ON THE HYDROLIZER.  SCRANTON HAS INSTALLED A WATER VAPOR SYSTEM ON THEIR HYDROLIZERS THAT HAS SOLVED THE H2S PROBLEM.  WAYNE AND HIS CREW ARE IN THE PROCESS OF PUTTING THIS SYSTEM ON OUR HYDROLIZER.

The second e-mail, that same day stated:

> FOR THE LIFE OF ME, I CANNOT UNDERSTAND WHY SOMEONE HASN'T TOLD US ABOUT THE WATER SYSTEM SCRANTON INSTALLED TO ELIMINATE THE H2S PROBLEM . . . . I AM GOING TO LET MARK @ ROBARDS, DAN @ HARMONY, KANE @ SEDALIA, TIM @ T-VILLE, AND KEITH @ CENTRAL KNOW

---

[4]It appears from the testimony of Dupps salesman James Lyle that the River Valley facility and the Scranton facility are the same.

ABOUT THIS IMMEDIATELY BEFORE THEY TOO HAVE SOMEONE OVERCOME
WITH FUMES.

* An "Accident/Injury Information" report was prepared following
the Key Incident, on Tyson letterhead, stating that Robert Key "was checking
the oil on the feed end of the hydrolizer when the fumes over took him."
This report contained the following Note:

> On duty Maintenance Supervisor took readings for Hydrogen
> Sulfide gases after the incident by holding the unit up around
> the seal of the Hydrolizer and recorded a reading of 50 ppm
> after unit alarmed at 10 ppm. One hour later the maintenance
> supervsor [sic] Wayne Carmichael took readings around the seal
> again only closer to where Robert had been working.  The unit
> alarmed at 10 ppm and reached as high as 900 ppm.

* An "Accident/Injury Follow-Up Report" was prepared on March 15,
2002.  This report noted that

> Robert Key was overcome by hydrogen sulfide gas while conducting
> preventive maintenance work on the hydrolizer.  It appears that
> the gas may have come from the packing gland off the feed end of
> the hydrolizer.  The leak appears to be minor, but the
> concentration of hydrogen sulfide were [sic] high (as high as
> 900 ppm prior to the installation of the misting system).

> This appears to only be a problem with "continuous feed" systems
> as opposed to "batch" systems.

> According to Joe Avance (Safety Manager), Bill Welborn (Plant
> Manager) sent an e-mail to determine what other RVAF facilities
> with "continuous feed" systems had done in this area.  Other
> RVAF Plants had installed exhaust ductwork over the hydrolizer
> (Harmony, Robards is installing duct work now, this was already
> scheduled before this accident occurred).  Other locations had
> previously installed water mist sprayers (Scranton, Sedalia is
> taking immediate action now to install water sprayers).

As noted above, the alleged defect in the Continuous Hydrolyzers is
that they leaked hydrogen sulfide gas to such an extent as to cause a safety
hazard, thus requiring Tyson to expend monies to modify them.  The testimony
and documents outlined above leave no doubt that Tyson was aware of this
level of danger well before the Keys Incident.  Canerday tested vapor
streams coming from the Continuous Hydrolizer weekly in 1998 and 1999, and
found them to be at a lethal level.  He testified that he attributed this

-10-

level to a distortion in his testing equipment, but Tyson offers no evidence that Canerday did anything to verify that the reading was truly inaccurate, which would be the expected course of action for any reasonable safety manager when faced with readings in the lethal level.  In addition, the testing done at the time of the Key Incident suggests that Canerday's readings were probably *not* distortions, as the Key Incident test levels reached 900 ppm.

Tyson employee Jim Rofkhar was also aware, in 1998, that testing of the vapors from the Continuous Hydrolyzers went "off the scale" of the meter he used to conduct the tests.

The Court finds that these test results of vapors emitted by the Continuous Hydrolyzers would have put a reasonable employee charged with testing hydrogen sulfide levels on notice of a serious problem with hydrogen sulfide being emitted from the Continuous Hydrolyzers.  The document entitled RIVER VALLEY ANIMAL FOODS HYDROGEN SULFIDE TEST is evidence that the test results did, in fact, put Tyson on notice of such a problem.  It warned employees of the danger, and directed them to test the area before working on a Continuous Hydrolyzer "where steam may be present" and to wear respirators at concentrations above 20 ppm.

The letter from Adams to Rofkahr dated June 16, 1998, is evidence that Tyson was by that date already making modifications - the installation of fans - in response to dangers from the high levels of hydrogen sulfide coming from the Continuous Hydrolyzers.  Canerday's testimony confirmed this, in that he stated that fans and "spray bars" were being used in 1998, 1999, and 2000.

The Welborn e-mails on March 14, 2002, are evidence that the Key Incident was not the first "incident" resulting from hydrogen sulfide leaks from the Continuous Hydrolyzers, and that other facilities had dealt with

-11-

the problem by "a water vapor system" or "water system."

When this evidence is viewed as a whole, it points toward only one conclusion, as to which the Court does not believe there can be any genuine dispute, or even any reasonable doubt: Tyson was aware, as early as 1998 and certainly by 2000, that hydrogen sulfide gas escaping from the Continuous Hydrolyzers posed a safety problem of sufficient magnitude to warrant the expenditure of funds to correct it.  Even if it did not have this awareness, it certainly could have had it, by the exercise of reasonable diligence. This knowledge triggered the running of the statute of limitations on any claim that the Continuous Hydrolyzers leaked hydrogen sulfide to such an extent as to create a safety hazard and require modification.  As the court said in **Martin**, it is not necessary that a plaintiff know the full extent of the harm suffered:  "indeed, the manifestation of the nature of the harm done . . . may be slight." **339 Ark. at 159, 3 S.W.3d at 690.**

7.   By the Court's calculations, the First Amended Tolling Agreement between Dupps and Tyson extended the statute of limitations period by nineteen months, from March 2, 2005, until on or about October 1, 2006. Counting back fifty-five months (three years plus nineteen months) from that date, it appears that products liability or negligence claims against Dupps which accrued on or after March 1, 2002, would be timely filed.  The negligence and strict liability claims of Tyson against Dupps accrued much earlier than March 1, 2002, and are not timely.  The statutes of limitations had already expired on those claims when Tyson filed suit on September 22, 2006, and summary judgment on those claims will be granted in favor of Dupps.

Because there were no tolling agreements between Tyson and Rains-Flo, the products liability and negligence claims Tyson brings against it are also untimely.

-12-

8.   Dupps and Rains-Flo next contend that Tyson's breach of warranty claims on the Continuous Hydrolyzers and packing material had expired before Tyson filed suit.  Dupps contends that the statute began to run with the delivery of the first Continuous Hydrolyzer to the Texarkana facility, which is said to be June, 1997.  Rains-Flo dates the running of the statute as against it from the time of the Key Incident, March 14, 2002.

Tyson's position *vis-a-vis* Dupps mirrors its position as to the tort claims, *i.e.*, that the statute of limitations for its breach of warranty claims did not commence until it discovered the alleged breaches, which it dates as October 10, 2003, the date of the Kelly Incident or, alternatively, March 14, 2002, the date of the Key Incident.

As to its breach of warranty claims against Rains-Flo, Tyson concedes that the statute of limitations has expired for packing material delivered prior to September 22, 2002.  It contends, however, that its breach of warranty claims against Rains-Flo for packing material delivered after that date are viable.

9.   **A.C.A. §4-2-725** provides that an action "for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued," and that a cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  It further provides that a breach of warranty occurs "when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

According to attachments to the Dupps Quotation dated May 13, 1996 - the authenticity of which is not contested by Dupps - Dupps stated that the Continuous Hydrolyzer and its and installation would "comply with OSHA

-13-

requirements."  Tyson contends that this language constituted an explicit warranty, and was the type of warranty which triggers the discovery provisions of **§4-2-725**.  For purposes of analyzing the motions now under consideration, the Court will treat this language as creating an explicit warranty, with the *caveat* that whether or not it did so - and whether such language accompanied the sale of each Continuous Hydrolyzer - are issues to be determined by the jury at trial.

The Continuous Hydrolyzers were sold on a "turnkey" basis, whereby Dupps would set up each machine, get it operational, and train Tyson's personnel in how to use it.  Until a machine became operational, there was no way to know whether it would "comply with OSHA requirements."  For this reason, the Court finds that the discovery provisions of **A.C.A. §4-2-725** are implicated by the "comply with OSHA requirements" language, a finding that leads necessarily to the issue of when Tyson should have discovered that the Continuous Hydrolyzers did not comply with OSHA requirements, if in fact they did not.

The gist of Tyson's position is that the Continuous Hydrolyzers did not comply with OSHA requirements because they created an exposure to hydrogen sulfide greater than was acceptable under OSHA regulations. Tyson cites the testimony of Jim Rofkahr to establish this proposition, but Rofkahr testified that he did not recall the OSHA limits on hydrogen sulfide exposure as of the date the Continuous Hydrolyzers were delivered to the Scranton facility.  Tyson also cites to an OSHA website, which gives the current hydrogen sulfide exposure limits.  That website indicates that the maximum permissible exposure limit for general industry "shall not exceed 20 ppm" except that if "no other measurable exposure occurs during the 8-hour work shift, exposures may exceed 20 ppm, but not more than 50 ppm (peak), for a single time period up to 10 minutes."  The recommended

-14-

exposure limit is 10 ppm.

This information is not particularly helpful, both because it speaks to current limits, and because it speaks in terms of maximum exposure of an employee, not maximum emission by a machine. The Court has found nothing in the submissions of either Dupps or Tyson that would resolve the issue of whether the Continuous Hydrolyzers emitted hydrogen sulfide in excess of any limits OSHA imposed on such emissions, or even whether OSHA imposes such limits. The burden rests upon Dupps, as the moving party, to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. The Court, therefore, finds that Dupps has failed to make the necessary showing on the issue of whether the statute of limitations had expired on Tyson's claim that Dupps breached an express warranty that the Continuous Hydrolyzers would "comply with OSHA standards." For this reason, Dupps' motion will be denied as to this claim.

10. Dupps contends that, as to the five Continuous Hydrolyzers purchased after the Key Incident on March 14, 2002, Tyson had "actual and specific knowledge of H2S from the hydrolyzers" and therefore there were no implied warranties as to those sales, pursuant to **A.C.A. §4-2-316.** **Subsection (b)** of that section provides that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired . . . there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him."

Dupps contends that after the Key Incident, Tyson ordered "5 more hydrolyzors just like the older ones. There were no design or manufacturing changes to the hydrolyzors relating to any tendency to release H2S, nor did Tyson request any changes. The last five hydrolyzors contained the same *alleged* defect as the first five." (Emphasis in original.)

Tyson does not deny that the last five Continuous Hydrolyzers were

-15-

exactly like the first ones, but rests instead on its argument that **§4-2-316** is not applicable.   It points out that it could not examine any given Continuous Hydrolyzer before Dupps installed it, and relies upon the U.C.C. Commentary to **§4-2-316** to the effect that the seller must demand examination by the buyer before this section comes into play.

The Court need not determine the applicability of **§4-2-316**, for two reasons.  First, the submissions of the parties leave no room for genuine doubt that the disclaimers of implied warranties accompanied each sale of a Continuous Hydrolyzer, and the Court has determined (see ¶12, *infra*) that those disclaimers are effective to exclude the warranties here in question.

Second, Tyson's position here is inconsistent with its position with regard to notice of breach, i.e., that it put Dupps on such notice after the Key Incident.  It is a generally applicable doctrine that "[d]amages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and, therefore, are not to be charged against him." **Lewis v. Mobil Oil Corp.**, **438 F.2d 500, 508 (8th Cir. 1971)**, citing **11 S. Williston, Contracts §1353**.  Given Tyson's position that it gave notice of breach of warranty to Dupps on the basis of the Key Incident on December 30, 2003, it can hardly be said to have been damaged by fault on the part of Dupps for purchases of Continuous Hydrolyzers after that date.  The Court, therefore, finds that Dupps is entitled to summary judgment in its favor as to all damages claims arising from the sales of Continuous Hydrolyzers after the Key Incident.

11.  The foregoing analysis with regard to avoidance of damages applies equally to Tyson's breach of warranty claims against Rains-Flo for packing material delivered after September 22, 2002.  There is no suggestion by any party that the composition of the Rains-Flo packing material changed

-16-

after that date, and Tyson continued to purchase the product although it claims to have believed that the product allowed the leakage of hydrogen sulfide from the Continuous Hydrolyzers.  To allow recovery under those circumstances would be to allow "[d]amages which [Tyson] might have avoided with reasonable effort without undue risk, expense, or humiliation."  This the Court will not do.

12.  Dupps contends that all of Tyson's breach of warranty claims are barred by the disclaimers and limitations of remedies provided in the documents setting forth the terms and conditions of the sales.

(a)  The evidence in support of Dupps as to disclaimers and limitations comes from the Affidavit of Jim Lyle, its sales manager, who avers that his standard sales practice was to include the "terms and conditions" with each "sales proposal or quote I submit to prospective customers, including Tyson."  Dupps also relies on the Affidavit of Jack Risner, a sales representative/engineer, who averred that he participated in some of the sales to Tyson, and in each case "personally sent by fax or mail the attached Terms and Conditions."

Lyle's Affidavit referred to an attached Quotation - dated August 30, 1996 - which led to the 1997 sale of the Continuous Hydrolyzer to the Scranton Facility.  At the bottom of each page of the Quotation, directly above the place for a signature showing that the Quotation is accepted, is a paragraph which includes the statement in all capital letters: "AGREEMENTS ARE MADE SUBJECT TO THE CONDITIONS ATTACHED HERETO INCLUDING THE LIMITED WARRANTY."

Also attached to Lyle's Affidavit is a copy of printed "TERMS AND CONDITIONS OF SALE," which provides, in relevant part, as follows:

WARRANTY; LIMITATIONS THEREOF
SELLER warrants the equipment of its manufacture to be free from defective workmanship for a period of ninety (90) days from the

-17-

date of shipment from SELLER'S plant, except rendering
equipment, which shall be guaranteed for one (1) year from date
of shipment from SELLER'S plant when given normal and proper
usage and while owned by the original PURCHASER from SELLER. .
. . PURCHASER'S sole and exclusive remedy against the SELLER
shall be for the repair or replacement of defective parts as
provided herein.

IN NO EVENT WILL THE SELLER BE LIABLE FOR ANY OTHER REMEDY
INCLUDING, BUT NOT LIMITED TO INCIDENTAL OR CONSEQUENTIAL
DAMAGES, LOSSES OR EXPENSES ARISING IN CONNECTION WITH THE USE
OF, OR INABILITY TO USE, ITS EQUIPMENT FOR ANY PURPOSE
WHATSOEVER.  THE LIMITED WARRANTY DESCRIBED HEREIN SHALL BE IN
LIEU OF ANY OTHER WARRANTY, EXPRESSED OR IMPLIED, BUT NOT
LIMITED TO, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A
PARTICULAR PURPOSE.

CONDITIONS
THE SELLER MAY HAVE MADE STATEMENTS ABOUT THE EQUIPMENT
DESCRIBED IN THIS AGREEMENT.  SUCH STATEMENTS DO NOT CONSTITUTE
WARRANTIES, SHALL NOT BE RELIED ON BY THE PURCHASER, AND ARE NOT
PART OF THIS AGREEMENT.  THE ENTIRE CONTRACT IS EMBODIED IN THIS
WRITING WHICH CONSTITUTES THE FINAL AND COMPLETE EXPRESSION OF
THE PARTIES' AGREEMENT, AND NO MODIFICATION OF THIS AGREEMENT
SHALL BE BINDING UPON EITHER PARTY UNLESS SUCH MODIFICATION
SHALL BE IN WRITING DULY ACCEPTED BY PURCHASER AND APPROVED BY
AN OFFICER OF SELLER AT ITS HOME OFFICE.

(Capitalization in original.)

(b)   The law regarding disclaimers of implied warranties is found at

**A.C.A. §4-2-316(2),** which provides that

to exclude or modify the implied warranty of merchantability or
any part of it the language must mention merchantability and in
case of writing must be conspicuous, and to exclude or modify
any implied warranty of fitness the exclusion must be by a
writing and conspicuous.  Language to exclude all implied
warranties of fitness is sufficient if it states, for example,
that "There are no warranties which extend beyond the
description on the face hereof."

The term "conspicuous" is defined in **A.C.A. §4-1-201(10)** as follows:

"Conspicuous", with reference to a term, means so written,
displayed or presented that a reasonable person against which it
is to operate ought to have noticed it.  Whether a term is
"conspicuous" or not is a decision for the court.  Conspicuous
terms include the following:
      (A) a heading in capitals equal to or greater in size than
the surrounding text, or in contrasting type, font, or color to
the surrounding text of the same or lesser size; and
      (B) language in the body of a record or display in larger
type than the surrounding text, or in contrasting type, font, or

-18-

color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

(c)   The Court finds that the statement "THE LIMITED WARRANTY DESCRIBED HEREIN SHALL BE IN LIEU OF ANY OTHER WARRANTY, EXPRESSED OR IMPLIED, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE" is sufficient to disclaim the implied warranties of merchantability and fitness for a particular purpose.  It is written, and specifically mentions "merchantability."  The writing contrasts from surrounding text by being placed in all capital letters, in a block of text under the "WARRANTY; LIMITATIONS THEREOF" heading.

Tyson contends that the type size of the disclaimer is small, its placement inconspicuous, the material embedded without borders or indentations, the facsimile impliedly blurry, and the terms not negotiated, but the Court is not persuaded by these arguments.  The typeface is large enough, and the facsimile copy clear enough, for the Court to read the disclaimer.  Its existence is specifically called to the attention of the buyer immediately above the signature line for acceptance on each page of the Quotation, and there is no legal requirement that negotiations have ensued about the matter before acceptance.

The Court finds that this disclaimer is so presented that a reasonable person - especially one charged with making capital equipment purchases for a large corporation - ought to have noticed it.  Cf. **Hunter v. Texas Instruments, Inc.**, **798 F.2d 299 (8th Cir. 1986)**(disclaimer on back of purchase order, but in larger print than surrounding writing, and called to attention of buyer by large print above line for buyer's signature on front of purchase order, was such that it should have attracted attention of reasonable buyer, and reasonable - not actual - notice is all that is required).  The Court, therefore, concludes that Dupps is entitled to

-19-

summary judgment in its favor on Tyson's claims for breach of implied warranty of merchantability and fitness for a particular purpose.

(d)   The law regarding limitation of remedies for breach of an express warranty (as opposed to disclaimer of the existence of any such warranty) is found at **A.C.A. §4-2-316(4),** which provides that "[r]emedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (§§ 4-2-718, 4-2-719)."

**A.C.A. §4-2-719,** provides that a contract for sale "may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." It also provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable," and that such limitation, in the case of purely "commercial" loss is not prima facie unconscionable.

Dupps' "TERMS AND CONDITIONS" express such a limitation: "PURCHASER'S sole and exclusive remedy against the SELLER shall be for the repair or replacement of defective parts as provided herein," and "IN NO EVENT WILL THE SELLER BE LIABLE FOR ANY OTHER REMEDY INCLUDING, BUT NOT LIMITED TO INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES ARISING IN CONNECTION WITH THE USE OF, OR INABILITY TO USE, ITS EQUIPMENT FOR ANY PURPOSE WHATSOEVER."

Tyson contends that this limitation of remedy fails of its essential purpose[5] and that - as a result - it is entitled to remedies as provided in the Uniform Commercial Code subtitle on Sales. It points out that **A.C.A. §4-2-719(2)** provides that "[w]here circumstances cause an exclusive or

---

[5]Tyson also contends that the limitation is unconscionable, but it does not flesh out this argument, and the Court will not devote any attention to it.

limited remedy to fail of its essential purpose, remedy may be had as provided in this subtitle."

In **Caterpillar Tractor Co. v. Waterson, 13 Ark. App. 77, 83, 679 S.W.2d 814, 818 (1984),** the Arkansas Court of Appeals explained the purpose of a limitation of remedies, and the circumstances under which limited remedies should be deemed to have failed of their essential purpose:

> The purpose of an exclusive remedy of replacement or repair of defective parts is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise.  From the point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered.  When the warrantor fails to correct the defect as promised within a reasonable time he is liable for a breach of that warranty.

Tyson contends that Dupps has - even to date - failed to replace or repair the Continuous Hydrolyzers so that they do not leak dangerous amounts of hydrogen sulfide, and thus the limited remedy has failed of its essential purpose. Such failure, Tyson contends, is a breach of the express warranty that the machines would comply with OSHA requirements, and makes available to Tyson the remedies provided for breach of that warranty under the Uniform Commercial Code.

Dupps counters that Tyson "never requested that Dupps attempt to repair or replace any part of the hydrolyzor within the one (1) year warranty period provided by Dupps' limited and exclusive warranty."  This counter does not, however, address Tyson's claim of an explicit warranty that the Continuous Hydrolyzers would "comply with OSHA requirements," the one warranty as to which the Court has found the four-year statute of limitations has not been shown to apply.  As with other issues related to that warranty, the Court finds that the "failure of essential purpose" argument must be submitted to the trier of fact.

13.    Dupps next contends that the breach of warranty claims are barred by **A.C.A. §4-2-607**, because timely notice of breach was not given.  **A.C.A. §4-2-607(3)** provides that "[w]here tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Dupps contends that notice was not given until December 30, 2003, over 21 months after the Key Incident.  It contends this notice was not timely as a matter of law.

Tyson, for its part, contends that Dupps was notified of the Key Incident in October, 2002, and put its insurance carrier on notice of a potential claim as a result.  It claims that these circumstances create a jury issue as to whether notice of the breach of warranty claims was timely given to Dupps.

As stated in **James A. Rogers Excavating, Inc. v. R.A. Young & Son, Inc.**, **3 Ark. App. 297, 625 S.W.2d 560 (1981)**, the reasonableness of notice of breach is usually a question of fact.  The Court finds that especially true in this case, where the parties do not agree on when the notice was given.  For that reason, as to Tyson's claim for breach of a warranty that the Continuous Hydrolyzers would "comply with OSHA requirements," Dupps' motion will be denied.

14.    Dupps contends that any attempt by Tyson to recover Workers' Compensation benefits paid to the Kelley Estate or to Drumm is barred by Tyson's failure to intervene in the lawsuits filed in regard to those incidents, pursuant to **A.C.A. §11-9-410**, and failure to put Dupps on notice that it was asserting any subrogation rights or claims in respect thereto.

Tyson does not address this contention, and the Court finds no evidence that Tyson is seeking to recover on this basis.  It will not, therefore, address this argument.

-22-

15.   Dupps contends that Tyson has failed to state a claim sounding in strict products liability because **A.C.A. §4-86-102** requires personal injury, death, or property damage, and Tyson alleges only economic loss. Because the Court has already determined that the statute of limitations bars these claims, the Court need not address this contention.

16.   Dupps contends that it is entitled to summary judgment because Tyson has not "disclosed any evidence of damages, which is an essential element of their prima facie case."  The Court notes that Tyson has appended a document entitled "RVAF Facilities" to its Combined Response To Defendants' Statement of Undisputed Material Facts.  This document is described in the exhibit list as "Tyson Damages Spreadsheet."  While this document is extremely attenuated, the Court will accept it as some evidence of damages, and summary judgment on this basis will be denied.

**IT IS THEREFORE ORDERED** that the **Motion For Summary Judgment Of The Dupps Company** (document #25), the **Amended Motion For Summary Judgment Of The Dupps Company** (document #32), and the **Second Amended Motion For Summary Judgment Of The Dupps Company** (document #38) are **granted in part and denied in part**.  The motions are **denied** insofar as they seek summary judgment with regard to Tyson's claim that Dupps breached an express warranty that its Continuous Hydrolyzers would "comply with OSHA requirements." The motions are **granted** in all other respects, and all claims of Tyson Foods, Inc., and Tyson Poultry, Inc., against The Dupps Company, except for the claim that Dupps breached an express warranty that the Dupps Continuous Hydrolyzers would "comply with OSHA requirements," are **dismissed with prejudice**.

**IT IS FURTHER ORDERED** that the **Motion For Summary Judgment** of defendant Rains-Flo Manufacturing Company (document #34) is **granted**, and the claims of Tyson Foods, Inc., and Tyson Poultry, Inc., against Rains-Flo

-23-

Manufacturing Company are hereby **dismissed with prejudice.**

**IT IS SO ORDERED.**

       **/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**