```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION

TYSON FOODS, INC. and
TYSON POULTRY, INC.                                    PLAINTIFFS

          v.              Civil No. 06-5177

THE DUPPS COMPANY and
RAINS-FLO MANUFACTURING COMPANY                        DEFENDANTS
```

## O R D E R

Now on this 4th day of January, 2008, comes on for consideration **Plaintiff's Motion For Temporary Stay** (document #74), and from said motion, the supporting documentation, and the response thereto, the Court finds and orders as follows:

1.   This products liability case was filed on September 22, 2006. Its subject matter is alleged defects in machines known as Continuous Hydrolyzers, which plaintiffs Tyson Foods, Inc., and Tyson Poultry, Inc. ("Tyson") purchased from defendant The Dupps Company ("Dupps"). Tyson's claims against separate defendant Rains-Flo Manufacturing Company have been dismissed, as have all the claims against Dupps except for one specific narrow claim that Dupps breached an express warranty that the Continuous Hydrolyzers would "comply with OSHA requirements." The matter is set for trial on January 22, 2008.

2.   Tyson now moves for a stay of the proceedings, contending that it is "severely handicapped" in its ability to prosecute its claim against Dupps because of "an on-going criminal investigation" into the death of one of its employees, Jason Kelley. The motion makes two contentions:

* First, Tyson contends that it cannot present records related to the amounts of hydrogen sulfide released by the Continuous Hydrolyzers without "a likely waiver of its claim of attorney work-product privilege in the

criminal investigation"; and

   *   Second, Tyson contends that several of its employees - specifically Bill Welborn and Joey Avance - are expected to assert their Fifth Amendment privilege and withhold testimony in the civil trial because of pending criminal investigations.

   Dupps strongly opposes the request for a stay of these proceedings, characterizing the request as "nothing more than an eleventh hour request for an indefinite continuance."

   3.   The background of the issue now presented -- as drawn from facts which were undisputed during briefings on motions for summary judgment -- is as follows:

   (a)   On October 10, 2003, Jason Kelley sustained fatal injuries at Tyson's Texarkana rendering facility "reportedly" as a result of hydrogen sulfide exposure while adjusting the packing seals on a Continuous Hydrolyzer.

   (b)   There had been another incident involving an employee named Robert Key who "reportedly" had been overcome with hydrogen sulfide fumes at the Texarkana facility -- fortunately not with fatal results -- on March 14, 2002.

   (c)   Bill Welborn was the Plant Manager at the Texarkana facility at relevant times and, following the Key incident, he sent two e-mails to Tyson officers and employees.  These e-mails are considered important evidence in the case by all parties.

   (d)   In a June 23, 2006, letter from attorney John Everett (which apparently related to a deposition in the underlying wrongful death suit brought by Kelley's heirs), Mr. Everett said that his client, Welborn, "is the target of an investigation having the potential of exposing him to a criminal prosecution," and "will not testify in this case."  A similar

-2-

letter dated August 1, 2006, from attorney Gary Nutter was written on behalf of his client Joey Avance.  These letters pre-date the instant lawsuit.

(e)   According to the Affidavit of Jay T. Jorgensen, an attorney representing Tyson in connection with investigations of Kelley's death by the Occupational Health and Safety Administration ("OSHA") and the United States Department of Justice ("DOJ"), this investigation -- begun in 2004 -- is still on-going.  Jorgensen avers that "[a]s recently as November 2007, federal government officials interviewed a Tyson employee related to this incident."

4.   The Document Issue:

Jorgensen avers that, in response to a grand jury subpoena, Tyson has asserted "privileges" (judging from Tyson's brief, Jorgensen refers to the work-product privilege, and not the attorney-client privilege as argued by Dupps) regarding records of air quality monitoring in Tyson rendering facilities which "was ordered at the direction of Tyson's outside counsel following the fatality accident."

Tyson contends that, if it produces those records in the instant litigation, it will have waived the work-product privilege in connection with the criminal investigation.

The Eighth Circuit recognizes two categories of attorney work-product, with correspondingly different levels of protection:

> Ordinary work product includes raw factual information. Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories.  Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means.  In contrast, opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when the material demonstrates that an attorney engaged in illegal conduct or fraud.

**Baker v. General Motors Corp., 209 F.3d 1051 (8th Cir. 2000).**

-3-

It is clear from the context of the motion that what is at issue here is not opinion work-product -- but, rather, ordinary work-product, i.e., the raw factual data amassed by the air quality monitoring system installed after the Kelley incident.  Such data or its equivalent might well be impossible for Dupps to obtain from any source other than Tyson, and might well bear on the performance of the Continuous Hydrolyzers.

The Court need not decide these issues at this time, but will simply note that, given the lesser protection afforded ordinary work-product, Tyson's argument boils down to this:  it wants to postpone this litigation for (at least) some ten more months to prevent the government from obtaining in the criminal investigation certain information that might well be discoverable by its opponent in the civil litigation.

When the issue is couched in these terms, the Court does not find it a compelling, or even a very strong, reason to postpone the trial of this case.

5.   The Witness Issue:

Tyson contends that Welborn and Avance will invoke the Fifth Amendment if called to testify, and that such invocation will unfairly prejudice it by "implying that Tyson or its employees have engaged in criminal activity." It argues that both the parties and the public have an interest in resolving a pending criminal case, and that its rights in civil litigation should not be impaired by recognition of those rights.

The Court is not persuaded by these arguments since, when the narrow liability issue which remains in this case is made the focus of the analysis, it is entirely possible that neither Welborn nor Avance will be asked any questions which would require (or permit) them to invoke their Fifth Amendment rights not to incriminate themselves.  The issue here is not who or what caused Kelley's death but, rather, the quality of performance

-4-

of the Continuous Hydrolyzers and what it allegedly cost to bring them up to what had been represented. Moreover, even if questions at trial might trigger invocations of Fifth Amendment protections, the Court cannot determine in advance whether they could or should be honored. Such determinations can only be made in context.

The Court notes that Tyson failed to put the Court on notice of the potential problem posed by the investigation status of these witnesses for over a year during the pendency of this suit. Indeed, it waited until three weeks before trial to do so. The delay in bringing this situation to the Court's attention does not comport with Tyson's position regarding its importance -- notwithstanding Tyson's protestations that it "hoped that the criminal investigation would be completed by the scheduled January 22, 2008 trial date." While attorneys and litigants might reasonably hope their case will settle before trial, that would not justify waiting until the threshold of trial to inform the Court of the unavailability of a key witness.

The Court further notes that Dupps has been faced with potential civil liability in this matter for over a year, and that the basis for that liability has been a factor in its corporate existence since at least March, 2005, when the first of three Tolling Agreements was signed between Dupps and Tyson.

Finally, the Court is not persuaded that Tyson would necessarily suffer unfair prejudice by the invocation of the Fifth Amendment by any witness, inasmuch as such matters could be dealt with by appropriate pre-trial motions in limine and, if necessary, hearings out of the presence of the jury.

6. As the Supreme Court said in **Landis v. North American Co.**, **299 U.S. 248, 254-55 (1936)**, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on

its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment which must weigh competing interests and maintain an even balance."  In the case at bar, when these competing interests are weighed -- both as to the document issue and the witness issue -- the Court concludes that the motion should be denied.

**IT IS THEREFORE ORDERED** that **Plaintiff's Motion For Temporary Stay** (document #74) is **denied**.

**IT IS SO ORDERED.**

      **/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**